[No. 2607-1.    Division One.    May 5, 1975.]

JOSEPH H. TRETHEWEY et al, *Appellants*, v. BANCROFT-WHITNEY COMPANY, *Respondent*.

*Joseph H. Trethewey*, pro se, and *Trethewey & Brink*, *Brian A. Putra*, and *Joseph C. Calmes*, for appellants.

*Helsell, Paul, Fetterman, Todd & Hokanson, William A. Helsell*, and *Lauri D. Kohli*, for respondent.

JAMES, J.—Plaintiffs, partners in the practice of law, allege that on August 22, 1960, they purchased from the wife of "a former Washington state attorney, the equity in [the attorney's] law library for the sum of $400, paid to [the wife] and the assumption of $1,974.16 owed to Bancroft-Whitney Company by agreement with defendant."

Plaintiffs assert that their contract with Bancroft obligated them only to pay $1,974.16 in monthly installments of $25 and that during the approximate 79-month period involved, they would receive subsequently published "maintenance" volumes without additional cost to them. Plaintiffs further assert that the contract obligated Bancroft to thereafter continue to provide maintenance services "forever" for the sum of $25 per month.

Bancroft did provide maintenance or "upkeep" services, but collected monthly payments of only $25. Bancroft's normal charge for upkeep services for plaintiffs' library would have been $570 per year.

Plaintiffs further allege that, in 1969, Bancroft "undertook correspondence with plaintiffs demanding" increased monthly payments sufficient to pay normal maintenance service costs in addition to the original $1,974.16, and that upon plaintiffs' refusal to pay more than $25 a month, Bancroft "repudiated" the contract.

Plaintiffs' first claim is for specific performance and for damages sustained "during the discontinuance of" the upkeep services. Plaintiffs' second claim is that Bancroft has an exclusive contract with the State of Washington regarding appellate court decisions which "constitutes a conspiracy in restraint of trade and commerce unlawful under RCW 19.86.030." Plaintiffs' third claim is that Bancroft's exclusive contract with the State "constitutes a monopoly unlawful under RCW 19.86.040." Concerning their second and third claims, plaintiffs assert that they are "prohibited from purchasing" appellate reports except through Bancroft and that Bancroft will not sell to them. Plaintiffs seek an award of $100,000 in damages on each of their three claims and ask that the amounts awarded for claims two and three be "trebled as provided in RCW 19.86.090."

After pursuing discovery, Bancroft moved for a summary judgment of dismissal which was granted. Plaintiffs appeal.

Bancroft contends that its showing in support of its motion for summary judgment establishes that plaintiffs' "claim that they are entitled to perpetual upkeep services at the rate of $25.00 per month is based solely, if at all, upon the oral representations of" Bancroft's sales agent.

The contract upon which plaintiffs rely is a "Transfer Order Form," prepared by Bancroft and signed by one of plaintiffs' partners. In summary, it authorizes Bancroft to "[t]ransfer to [plaintiffs'] account $1,974.16 owing on the account of [the former attorney]" and lists the "books transferred." Plaintiffs "assume responsibility for payment of the balance owing" on the former attorney's account. "Terms of payment" are "monthly instalments of $25.00 until the full purchase price is paid." With reference to "upkeep" services for the books purchased, the transfer order form contains only the following language: "Enter my subscription [for the books purchased] and continue until further notice."

In support of the trial judge's ruling, Bancroft argues that because plaintiffs' first claim is based upon an alleged oral contract, it must be dismissed as a matter of law because

(1) the action is barred by RCW 4.16.080, the 3-year statute of limitations and because (2) the contract is void under the terms of RCW 19.36.010, the statute of frauds. We agree that for either reason the dismissal of plaintiffs' first claim was proper.

We read nothing in the transfer order form which can be construed to be an agreement either express or implied by which Bancroft was, in plaintiff Trethewey's words, "obligated to furnish me this library at $25 a month forever." However, in support of their claim, plaintiffs presented the testimony of Bancroft's sales agent. He stated that he had "*orally* reiterated to Joseph Trethewey on several occasions" (Italics ours.) that the contract was of perpetual duration. The transfer order form contains the following language: "No representation or agreement has been made by salesman not herein stated."

It is a general rule of substantive law that parol evidence of prior or contemporaneous conversations or declarations is incompetent to substitute a new or different agreement from that evidenced by a writing. 30 Am. Jur. 2d *Evidence* §§ 1016, 1017 (1967); *Mapes v. Santa Cruz Fruit Packing Corp.*, 26 Wn.2d 145, 173 P.2d 182 (1946). The evidence considered by the trial judge established that the essential promise upon which plaintiffs rely is not contained in the transfer order form. If such a promise was made by Bancroft's sales agent, it could only be proven by parol testimony.

With reference to the statute of limitations, plaintiffs first argue that RCW 4.16.040, the 6-year statute, controls. Their reasoning is that Bancroft's alleged obligation to provide perpetual upkeep services is a "liability express or implied arising out of a written agreement." RCW 4.16.040(2).

But as we have pointed out, nothing in the transfer order form either expressly or impliedly obligated Bancroft to forego its normal upkeep charges. In the cases cited by plaintiffs, the "liability" was clearly created by the written contract. The question in each case was whether that liability attached. For example, *DeBritz v. Sylvia*, 21 Wn.2d 317,

150 P.2d 978 (1944) and *American Aviation, Inc. v. Hinds,* 1 Wn. App. 959, 465 P.2d 676 (1970) hold that an acceptance of an offer may be implied from conduct as well as words, but in each case, the "liability" thus incurred was expressly created by the terms of the written contract.

Plaintiffs next argue that "[e]ven if the three-year statute were controlling, it remains the fact that appellants' complaint of February 13, 1973 was filed precisely three years after Bancroft-Whitney's letter of February 13, 1970 which finalized the breach of contract, . . ."

The facts do not support plaintiffs. We agree with Bancroft's contention that the alleged breach occurred either as a result of Bancroft's May 6, 1969, letter or, at the latest, with its January 26, 1970, letter. In its May 6, 1969, letter, Bancroft informed plaintiffs that in view of plaintiffs' refusal to increase their monthly payments,

> [t]he only alternative solution is to exercise our option to discontinue current publication service. Therefore, since we have received no response from you to our letter of April 2, 1969 and as notified therein, we have now cancelled all subscription service.

On January 26, 1970, Bancroft wrote:

> Due to clerical error here, [the May 6] cancellation was not properly effected and publications have continued to be sent to the firm.
>
> We have corrected this discrepancy now and again we wish to advise that all services on the publications listed below have been cancelled as of this date: . . .

In response, on February 5, 1970, plaintiffs wrote Bancroft as follows:

> *We consider your letter of January 26, 1970 and your letter of May 6, 1969 to be an anticipatory breach of our contract with you.* We would like to point out to you that numerous damages will flow from *your breach of contract.* . . . We intend to keep accurate and minutely detailed records of each necessary trip to the County Law Library caused by virtue of the fact that *you have breached your contract.*
>
> . . .

> Under the circumstances, however, we have no other alternative then [*sic*] to bring an immediate lawsuit in the Superior Court of the State of Washington for *your anticipatory breach.*

(Italics ours.) Plaintiffs' first claim is barred by the 3-year statute of limitations.

With reference to the statute of frauds, Bancroft relies upon RCW 19.36.010, which provides that, unless in writing and signed by the party to be charged therewith, every agreement, contract, and promise shall be void if "by its terms [it] is not to be performed in one year from the making thereof."

> The memorandum or memoranda in writing, to satisfy the requirements of the statute, must not only be signed by the party to be charged but it must also be so complete in itself as to make recourse to parol evidence unnecessary to establish any material element of the undertaking. Liability cannot be imposed if it is necessary to look for elements of the agreement outside the writing. . . . It follows that parol evidence is not admissible or permissible to establish an essential provision of the alleged agreement nor to supply deficiencies in the writing.

(Citations omitted.) *Smith v. Twohy,* 70 Wn.2d 721, 725, 425 P.2d 12 (1967).

Plaintiffs respond by contending that RCW 19.36.010 is inapplicable because superseded by RCW 63.04.050, the uniform sales act's statute of frauds. RCW 63.04.050, which was in effect in August 1960, provided that an oral contract for the sale of goods valued in excess of $50 *was* enforceable if partially performed.[1] Plaintiffs argue that the supplying of upkeep services without requiring payment for approximately 8 years was part performance and Bancroft's alleged oral agreement was, therefore, enforceable.

■ The answer to this contention is that RCW 19.36.010 was neither expressly nor impliedly repealed by RCW

---

[1] RCW 63.04.050, which was in effect at the time of the transaction, was repealed with the adoption in Washington of the Uniform Commercial Code, June 30, 1967. RCW 62A.

63.04.050. As Professor Ralph W. Johnson points out in *Sales—A Comparison of the Law in Washington and the Uniform Commercial Code*, in *Collected Essays on the Uniform Commercial Code in Washington* 21, at 39 (1967):

In connection with the matter of part performance, it is worth while [*sic*] to recall that the "contract" Statute of Frauds, RCW 19.36.010, also applies to many sales of goods. It provides in paragraph (1), "Every agreement that by its terms is not to be performed in one year from the making thereof" is void unless in writing. The Code does not affect this statute.

However, as Professor Johnson notes, the Washington cases are "badly confused" as to whether part performance takes an oral contract out of RCW 19.36.010, if the same performance takes it out of RCW 63.04.050.

We are persuaded that the better-reasoned cases followed the rule as stated in *Union Sav. & Trust Co. v. Krumm*, 88 Wash. 20, 33, 152 P. 681 (1915):

The doctrine of part performance, however, has no application to this clause [which declares void every oral contract not to be performed within 1 year] of the statute of frauds. In the nature of the case, where the statute is directed solely to the time of performance and not to the character or subject-matter of the contract, part performance could not remove the ban of the statute without in effect repealing the statute.

*Union Sav. & Trust Co.* is cited in Annot., 6 A.L.R.2d 1053, at 1083 (1949) in support of the statement:

The rule may be generally stated that the part performance of services under an oral contract not to be performed within a year does not remove the contract from the operation of the statute of frauds, with the result that an action may not be maintained for the breach of the entire contract.

The general rule is elaborated in 73 Am. Jur. 2d *Statute of Frauds* § 506 (1974):

With regard to the effect of part performance, by one or both parties, on such a contract in an action to recover damages for the part which is still executory (a recovery

based upon a loss accruing from what has not been done), the rule may be generally stated that the part performance of services under an oral contract not to be performed within a year does not remove the contract from the operation of the statute of frauds, with the result that an action may not be maintained for the breach of the entire contract. Even in a jurisdiction which has adopted the rule that part performance will prevent the operation of the statute so far as performance has gone, there can be no recovery for the breach of a contract not to be performed within a year.

(Footnotes omitted.) Bancroft's counsel stated in open court that no claim is asserted for past-due upkeep charges.

█ The statute of frauds is not a doctrine in equity, it is a positive statutory mandate which renders void and unenforceable those undertakings which offend it. *Smith v. Twohy, supra.*

Bancroft's alleged promise concerning upkeep services was not in writing and Bancroft's part performance was ineffectual to avoid the bar of the statute. Plaintiffs' first claim is also barred by the statute of frauds. The trial judge did not err in determining that plaintiffs' first claim must be dismissed as a matter of law.

The recoveries sought in plaintiffs' second and third claims are based upon Washington's Consumer Protection Act, RCW 19.86. Plaintiffs assert that because of its exclusive contract, Bancroft has been able to deprive them of upkeep services, making their law library obsolete. Plaintiffs charge that Bancroft's exclusive contract creates a monopoly in restraint of trade.

RCW 19.86.090 authorizes civil actions for damages resulting from the violations of RCW 19.86.030 (restraint of trade) and RCW 19.86.040 (monopoly). In addition to actual damages and attorney's fees, a discretionary award of treble damages is authorized.

Bancroft contends that its exclusive contract with the State is exempted from the Consumer Protection Act's prohibitions and that plaintiffs' second and third claims of

error were, therefore, properly dismissed as a matter of law. We agree.

When plaintiffs' action was commenced, RCW 19.86.170 provided:[2]

Nothing in this chapter shall apply to actions or *transactions* otherwise *permitted*, prohibited *or regulated* under laws administered *by* the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or *any* other *regulatory body* or officer *acting under statutory authority of this state* or the United States: . . .

(Italics ours.) Bancroft's contract to sell and distribute appellate decisions is with the Commission on State Law Reports. The commission is created by RCW 2.32.160.[3] If Bancroft's contract was a transaction "permitted, . . . or regulated . . . by . . . [a] regulatory body . . . acting under statutory authority . . .", it was an "exempted" transaction.[4]

---

[2]RCW 19.86.170 was amended by Laws of 1974, 1st Ex. Sess., ch. 158 to read:

"Nothing in this chapter shall apply to actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or *actions or transactions permitted by* any other regulatory body or officer acting under statutory authority of this state or the United States: . . ." (Changes italicized.)

[3]"There is hereby created a commission to supervise the publication of the decisions of the supreme court and court of appeals of this state in both the form of advance sheets for temporary use and in permanent form, to be known as the commission on supreme court reports, and to consist of six members, as follows: The chief justice of the supreme court, who shall be chairman of the commission, the reporter of decisions of the supreme court, the state law librarian, a judge of the court of appeals designated by the chief judges, the public printer, and a representative of the Washington state bar who shall be appointed by the president thereof. Members of the commission shall serve as such without additional or any compensation."

[4]The landmark case of *Parker v. Brown*, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943) is generally recognized as the progenitor of the doctrine of "state action exemption" as applied to the Sherman Act. *See* Slater, *Antitrust and Government Action: A Formula for Narrowing Parker v. Brown*, 69 Nw. U.L. Rev. 71 (1974). Washington's unfair

■ Clearly, the "transaction" was one "permitted" by the commission. The commission is itself a party to the contract. The question then is whether Bancroft's contract was a "transaction" permitted or regulated by a "regulatory body . . . acting under statutory authority . . ." A similar question was present in *Dick v. Attorney General*, 83 Wn.2d 684, 521 P.2d 702 (1974). It was there contended that, insofar as the practice of the art of "drugless healing" is permitted by law, "the director of licenses is not a 'regulatory body or officer' within the meaning of RCW 19.86.170, because his regulatory powers are not as comprehensive as those of the Insurance Commissioner, the Washington Utilities and Transportation Commission, or the Federal Power Commission." *Dick v. Attorney General*, *supra* at 686-87. The Court of Appeals had ruled that "because the respondent's [drugless healer] practice was regulated *generally* under the provisions of RCW 18.36, it was exempt from the provisions of the Consumer Protection Act." (Italics ours.) *Dick v. Attorney General*, *supra* at 688. The Supreme Court found at page 688 that "this holding is broader than the statute justifies." Rather, the court said, the use of the words "actions or transactions" rather than "business or trade" in RCW 19.86.170 makes clear the legislative intent that the "particular" transaction is to be scrutinized to determine whether it is regulated by a regulatory body.

The powers of the Commission on State Law Reports are specified by RCW 2.32.170.[5] In summary, the commission is

practices act is patterned after the Sherman Act. RCW 19.86.170 is a legislative determination that antitrust concepts may, in particular circumstances, be incompatible with desirable "state action." The legislative philosophy is expressed in RCW 19.86.920:

> It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest, . . .

[5]"The commission is authorized and directed, from time to time: To determine all matters whatsoever, pertaining to the publication (which is defined as including printing, binding, sale and distribution) of such decisions, in both such temporary and permanent forms, including the

given complete authority to regulate the publication, sale, and distribution of appellate reports. The commission is empowered to regulate "all matters whatsoever, pertaining" to appellate reports, including the price to be charged for both bound volumes and advance sheets. Clearly, the Commission on State Law Reports is a "regulatory body."

A review of the contract with Bancroft reveals that the commission has fully exercised its regulatory powers by detailed provisions concerning the sale and distribution of Washington appellate reports. The commission has fixed the prices at which the reports are to be sold and has reserved the right to terminate Bancroft's contract "at any time." Bancroft's exclusive contract is clearly a "regulated" transaction. It is, therefore, a transaction which, by the terms of RCW 19.86.170, is exempted from the Consumer Protection Act's proscriptions.

Affirmed.

SWANSON and CALLOW, JJ., concur.

---

making of all specifications for material, workmanship, binding, size, number of pages, contents, and arrangement thereof, frequency of publication, and all other matters, whether similar to the foregoing or not, that relate to such publication: *Provided,* That the specifications shall require that the type to be used shall not be smaller than eleven point on a thirteen point slug; to establish a uniform price at which such decisions, in temporary and permanent form, either separately or together, shall be sold to any purchaser, public or private, including the state, its departments, subdivisions, institutions, and agencies; to establish said price at the amount which is, as nearly as may be, equal to the cost of such publication and the expenses incidental thereto, which price, if it is deemed necessary and proper by the commission in the light of substantially changed costs and expenses, may be adjusted annually, and in no event oftener then semiannually; to enter, in the name of the commission, into any and all contracts with any persons, firms, and corporations, deemed by the commission necessary and proper to carry into effect the foregoing powers, with authority to include all such terms and conditions as the commission in its discretion shall deem fit; to modify or terminate, with the consent of the other party thereto, any contract existing on June 9, 1943 for the publication of such decisions."